**SO ORDERED.**

**SIGNED this 31 day of October,2013.**

*Stephani W. Humrickhouse*
_____
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
### RALEIGH DIVISION

IN RE:

**DENIS E. BERGERON,**                    **CASE NO. 13–02912–8–SWH**
                                          **CHAPTER 11**
         **DEBTOR.**

## ORDER DENYING MOTION TO APPOINT CHAPTER 11 TRUSTEE

Pending before the court is the motion of Prestige Wealth Management, LLC ("Prestige")

for the appointment of a chapter 11 trustee pursuant to § 1104(a) of the Bankruptcy Code,[1] which

is opposed by Denis E. Bergeron ("debtor").  Also before the court are two requests made by

Prestige during the course of its motion, which were taken under advisement.  First, Prestige

requests that several findings made by the Wake County Superior Court in orders it entered on

December 5, 2012, and March 12, 2013, holding the debtor in civil contempt, be given collateral

estoppel effect.  Second and pursuant to Fed. R. Evid. 801(d)(2)(A), Prestige moves the admission

_____

[1]All statutory references, unless otherwise indicated, are to the Bankruptcy Code,
11 U.S.C. § 101 et seq.

of the transcripts of the contempt proceedings that were conducted on November 30, 2012, and February 21, 2013, which culminated in the debtor being held in civil contempt.[2]

Hearings were held on these matters in Raleigh, North Carolina, on June 19, 2013, July 9, 2013, August 5, 2013, August 14, 2013, September 3, 2013, and September 4, 2013.  For reasons that follow, the motion for the appointment of a chapter 11 trustee is **DENIED.**

## BACKGROUND

Prior to the petition date, the debtor was the manager and majority member of IYB Properties, LLC ("IYB"), a North Carolina limited liability company organized on September 28, 2007, and located in Bunn Level, North Carolina.  In his capacity as manager and on behalf of IYB, the debtor executed a promissory note, which was subsequently amended and restated on May 25, 2012, in favor of Prestige in the original principal amount of $1.5 million ("promissory note").  In accordance with the restated operating agreement executed in May 2012 ("restated operating agreement"), the membership of IYB was comprised of the debtor and Prestige, each holding

---

[2] On September 10, 2013, and in accordance with the court's oral ruling at the conclusion of the final hearing on September 4, 2013, Prestige filed a supplemental memorandum designating the portions of the transcripts it contends support the appointment of a trustee. [DE–127].  Despite complying with the court's directive, Prestige continues to maintain that the transcripts, in their entirety, should be admitted as substantive evidence.  However and pursuant to Fed. R. Evid. 401, the transcripts, in their entirety, are not relevant to the issue before the court.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").  Rule 801(d)(2)(A) of the Federal Rules of Evidence provides that the statement of an opposing party is excluded from the definition of hearsay when offered against that party. Fed. R. Evid. 801(d)(2)(A); see Neighbors Law Firm, P.C. v. Highland Capital Mgmt, L.P., No. 5:09–CV–352, 2010 WL 3767140, at *6 (E.D.N.C. Aug. 16, 2010) (holding that statements contained in an excerpt of a transcript, which were made by the opposing parties during the course of a prior bankruptcy hearing, "do not fall within the definition of hearsay because they are each admissions of a party opponent . . . under Fed. R. Evid. 801(d)(2).").  However, Fed. R. Evid. 402 does not permit the wholesale admission of materials, including the transcripts at issue, which are not relevant for purposes of determining whether appointment of a trustee is appropriate in this case.  See Fed. R. Evid. 402 (stating that relevant evidence, as defined by Fed. R. Evid. 401, is admissible unless, inter alia, the Federal Rules of Evidence provide otherwise).

membership interests of 85% and 15%, respectively.  Article 1.5(a) of the restated operating agreement, listing the limited purpose of IYB, provides that "[t]he specific purpose and business . . . shall be to acquire the real estate situated at 8312 and 8314 Fayetteville Road, Raleigh, North Carolina ("the Property") and to own, develop, [and] construct improvements upon and otherwise manage the Property."  Furthermore, IYB "may not engage in any other business venture without the unanimous written consent of all Members."  The restated operating agreement also stated that IYB "shall maintain only one bank account[,]" online access to which would be provided to all members, including Prestige.

The proceeds advanced under the promissory note ("loan proceeds") were to be used by IYB to expand an existing recycling operation owned by the debtor. Specifically, use of the loan proceeds was limited to the acquisition of certain tracts of real property, the purchase of equipment and the construction of a pre–fabricated building pursuant to an independent contractor agreement attached to the promissory note as Exhibit B.  The promissory note provided that "[t]he use of the loan proceeds inconsistent with the purposes herein described shall be a default . . . ."

The debtor, in consideration of, and as an inducement for, the advancement of the loan proceeds, executed a personal guaranty in favor of Prestige, which was later amended and restated on May 21, 2012 ("personal guaranty").  In addition to the personal guaranty, the promissory note was purportedly secured by a deed of trust and security agreement (collectively "security instruments") dated May 17, 2012, and executed by the debtor, individually and in his capacity as manager of IYB and DB Misfit Enterprises, Inc. ("DB Misfit"), in favor of Prestige.[3]  Thus, the

---

[3] Nothing in this order should be construed to foreclose or otherwise prohibit any party from challenging the validity of the security instruments or the extent, scope or priority of any liens arising therefrom.

collateral serving as security for the promissory note included the real property, which is more particularly described below, and equipment owned or thereafter acquired by the debtor, DB Misfit and IYB, together with the proceeds and products thereof.

W. Thurston Debnam, Jr. ("Mr. Debnam") of Smith Debnam Narron Drake Saintsing & Myers, LLP, was retained to represent IYB in the first tier of the two–tier transaction with Prestige, the purchase of two tracts of real property, consisting of 2.278 acres and situated at 8312 and 8314 Fayetteville Road, Raleigh, North Carolina ("real property"), for $500,000.00.   As for the second tier, the loan proceeds remaining after the acquisition of the real property, $936,685.31, were escrowed in Mr. Debnam's trust account and subsequently transferred to a bank account held by IYB with Crescent State Bank.  Prestige, however, did not have access to this bank account.

Between May 30, 2012, approximately five days after execution of the promissory note, and June 12, 2012, the various entities owned, controlled or affiliated with the debtor executed fourteen separate promissory notes in favor of IYB, the original principal amounts of which ranged from $4,000.00 to $500,000.00.  These promissory notes, which were prepared by third parties at the request of the debtor, transferred the loan proceeds to entities in which Prestige did not have an interest.

Prestige, by and through counsel, notified the debtor on July 25, 2012, of its position that it considered IYB to be in default of the promissory note, the security agreement, and the restated operating agreement.  Prestige also made several demands, the satisfaction of which by a proscribed date would stay its pursuit of any and all remedies available upon default, "including[] . . . acceleration of the balance due under the note, foreclosure of the collateral, and collection of its attorney fees in enforcing its rights."  Due to the failure to comply with any of the demands and

4

make the payment called for under the promissory note on August 17, 2012, Prestige declared IYB

to be in default by letter dated August 22, 2012 ("notice of default").  The notice of default provided,

inter alia, that the entire principal balance of $1,487,640.19, plus accrued interest due under the

promissory note was accelerated and declared immediately due and payable.[4]

On August 29, 2012, approximately seven days after the notice of default and three months

after the transaction was initiated, Prestige commenced a civil action against the debtor, IYB, DB

Misfit, NGB Land Development, LLC, and 1UP Country Store in the Wake County Superior Court,[5]

seeking injunctive relief and damages for fraud, conversion, breach of fiduciary duty, constructive

trust and accounting, and breach of the security instruments, Case No. 12–CVS–12306 ("state court

action").  At the request of Prestige, the Wake County Superior Court ("state court") entered a

temporary restraining order on August 29, 2012, enjoining the debtor, IYB and DB Misfit from

exercising further management and control over IYB as well as access to, and use, misappropriation

and conversion of, all its facilities and financial resources ("temporary restraining order" or "TRO").

The temporary restraining order also prohibited the debtor, IYB and DB Misfit from exerting

custody or control over the assets of IYB and the sale, barter, exchange, disposition or other transfer

of those assets.[6]  On October 3, 2012, the temporary restraining order was expanded to include

---

[4] With respect to accrued interest, the notice of default indicated that "interest . . . is accruing
in the amount of $537.20 per day from August 18, 2012 through August 27, 2012[;]" however,
"[a]fter August 27, 2012, interest per day on the unpaid principal will be $826.47."

[5] During the course of the state court action, the complaint was amended twice to add 1UP
Allstar ServiCenters, LLC ("1UP Allstars"), 3800 Opportunity Lane, LLC ("3800 Opportunity
Lane"), 2UP Allstar ServiCenters, LLC ("2UP Allstar"), 3UP Allstar ServiCenters, LLC ("3UP
Allstar"), Allstar Environmental, LLC ("Allstar Environmental"), and NC Green, Inc. as defendants
("state court defendants").

[6] With the consent of the parties, the temporary restraining order was extended for two
additional thirty–day periods by consent orders entered on September 7, 2012, and October 1, 2012,

various entities the debtor owned, controlled or was otherwise affiliated with, including: Allstar Environmental, Allstar Demolition, Recycling and Salvage, LLC, 1UP Allstar, Midas of South Raleigh, LLC, 3800 Opportunity Lane, Swift Creek Properties, LLC, 159 East Chatham Street, LLC, Concept of Innovations, Inc., Misfit Enterprises, LLC, and 100 Tweety Lane, LLC (collectively "additional entities"). These additional entities, along with the debtor, IYB and DB Misfit, "[we]re further restrained from directly or indirectly (i) disposing of any secured property pledged to Prestige . . . and from directly or indirectly (ii) interfering in any way with the efforts of Prestige and or its agents to repossess and otherwise exercising [sic] Prestige's rights as a secured party provided by law . . . ."

Mr. Debnam was also engaged to represent the debtor, IYB and DB Misfit in connection with the state court action and the temporary restraining order. Mr. Debnam, acting on their behalf, filed an answer to the complaint in the state court action, denying the allegations raised by Prestige therein and asserting several affirmative defenses.

During the course of the state action and after obtaining the temporary restraining order, Prestige commenced various collection efforts, which included retaining Triangle Recovery and Investigative Services, Inc. ("Triangle") to repossess collateral pledged by the debtor, IYB and DB Misfit as security for the promissory note. Ray Johnson ("Mr. Johnson"), a licensed private investigator and the principal of Triangle, was retained by Prestige to investigate, locate, and recover the collateral serving as security from various locations. Despite the debtor's lack of cooperation and without ascertaining the validity and extent of the security interests asserted by Prestige, Mr. Johnson acknowledged that he was able to recover a portion of the collateral. Items that were

---

respectively.

6

recovered but not retained by Triangle, were liquidated or otherwise disposed of by Prestige. For example, at the request of Prestige, TT&E Iron & Metal crushed approximately 450 automobiles that were recovered by Triangle, producing scrap metal worth approximately $235,000.00.

In response, the debtor took certain measures that were designed to delay, circumvent or frustrate the collection methods utilized by Prestige under the security instruments. These methods, all of which were prohibited by the temporary restraining order, included systematic transfers of the loan proceeds between the bank accounts of various entities owned, controlled or affiliated with the debtor, none of which were authorized or entitled to utilize them. The debtor also interfered with the repossessions attempted by Prestige and its agent, Triangle. This interference ranged from a lack of cooperation and sequestration of certain items of collateral to the discharge of a firearm in the vicinity of a recovery agent.

On October 29, 2012, and after making the requisite findings, the state court entered a preliminary injunction against the state court defendants and additional entities, forbidding them from taking any action contrary to the temporary restraining order ("preliminary injunction"). The preliminary injunction also directed the debtor to supply Prestige with the disposition and location of the loan proceeds by November 5, 2012.

Thereafter, the state court scheduled a hearing for November 30, 2012, and directed the debtor to appear and show cause why he should not be held in contempt for failing to sufficiently identify the location and use of the loan proceeds by the proscribed date. During the course of his testimony at this hearing, the debtor acknowledged that he made various transfers that were prohibited by the temporary restraining order and preliminary injunction, but stated that such transfers were made at the suggestion and instruction of Mr. Debnam. The state court entered an

7

order on December 5, 2012, holding the debtor in civil contempt for willfully violating the temporary restraining order and the preliminary injunction ("contempt order"). As a result and in accordance with N.C. Gen. Stat. § 5A–21(b), the debtor was imprisoned for a term of ninety days.[7] This determination was based on the following findings set forth in the contempt order:

12.  Defendants, including Defendant Denis Bergeron, have violated the TRO and the Preliminary Injunction, in the following respects:

(a) Defendants have not identified the location and use of the proceeds of the Loan, in that the materials provided to the Court . . . are inadequate, insufficient, and lacking in detail so as to comply with the Preliminary Injunction.

(b) Defendants have not provided an accounting of the Loan proceeds, in that the materials provided to the Court . . . are inadequate, insufficient, and lacking in detail so as to provide an accurate and reliable accounting in compliance with the Preliminary injunction.

(c) Defendants, and in particular Defendant Bergeron, have violated the TRO and the Preliminary Injunction in multiple respects and on multiple occasions by transferring funds to other persons and entities contrary to the express prohibitions of the TRO and the Preliminary Injunction.

(d) Plaintiff also offered evidence, which Defendants neither challenged nor contradicted, that Defendants, and in particular Defendant Bergeron, violated the TRO and the Preliminary Injunction by interfering with Plaintiff's efforts to exercise self–help remedies with respect to collateral for the Loan, to which self–help remedies Plaintiff was and is entitled, in that Defendant Bergeron

---

[7] N.C. Gen. Stat. § 5A–21(b) provides that "[a] person who is found in civil contempt may be imprisoned as long as the civil contempt continues, subject to the limitations provided in subsections (b1) and (b2) of this section." N.C. Gen. Stat. § 5A–21(b).  Subsection (b2), in turn, provides that "[t]he period of imprisonment for a person found in civil contempt shall not exceed 90 days for the same act of disobedience or refusal to comply with an order of the court." Id. § 5A–21(b2).  However, "[a]person who has not purged himself or herself of the contempt within the period of imprisonment imposed by the court under this subsection may be recommitted for one or more successive periods of imprisonment, each not to exceed 90 days." Id.

> caused, permitted, or enabled the discharge of firearms in the vicinity
> of and in proximity to Plaintiff's repossession agent and on other
> occasions physically interfered with and obstructed Plaintiff's
> exercise of its self–help remedies.
>
> . . .
>
> 14.  Defendants' noncompliance with and violation of the TRO and the Preliminary
> Injunction, and in particular the violations of and noncompliance by Defendant Denis
> Bergeron with the TRO and the Preliminary Injunction as set forth in Findings of
> Fact ¶ 12, were willful, without any justification, and inexcusable.

The state court also appointed, as an independent financial and accounting examiner, Hollingsworth, Avent, Averre & Purvis, P.A. ("HAAP"), a public accounting firm located in Raleigh, North Carolina, to investigate and evaluate the extent of the debtor's ability to comply with the provisions of the temporary restraining order and preliminary injunction.

Tina R. Purvis ("Ms. Purvis"), a certified public accountant and audit partner with HAAP, conducted the court–ordered investigation into the disposition of the loan proceeds and formulated an assessment of the debtor's financial status.  In addition to ascertaining that the debtor's books and records were not consistent with sound financial management or accounting standards, her investigation revealed that the debtor funneled the loan proceeds through thirty–six separate bank accounts belonging to either DB Misfit or the additional entities.  Ms. Purvis could not discern any legitimate business purpose for the debtor maintaining all those separate bank accounts.  The loan proceeds, according to Ms. Purvis' testimony and the reports summarizing the findings of her investigation,[8] were utilized by the debtor to cover some non–IYB expenses, including his own personal expenses.

_____

[8] Ms. Purvis prepared a report, as supplemented, summarizing her observations and findings for the state court.  Both reports were introduced and admitted into evidence during the course of the proceeding before this court and corroborated her testimony.

9

Pursuant to N.C. Gen. Stat. § 5A–21(b2), the state court held a hearing on February 21, 2013,

to determine whether the debtor had purged his civil contempt.  Based on the evidence introduced

at the hearing, which included the testimony and report of Ms. Purvis, that court entered an order

on March 12, 2013, finding that the debtor's civil contempt had not been purged ("second contempt

order") and, as a result, ordered that the debtor "be recommitted for an additional period of 90 days

following the expiration of the initial 90 days set forth in the Contempt Order."  The state court, in

arriving at this conclusion, made the following findings:

> 14.  Based on the testimony of Ms. Purvis, her reports presented to the Court, the testimony of Defendant Denis Bergeron, and the other evidence presented in open Court without objection, the Court finds that Defendant Denis Bergeron has not successfully purged his contempt of Court.  The Court further finds that Defendant Bergeron has not been fully compliant with the investigation efforts of Ms. Purvis and HAAP.  Further, Ms. Purvis requires additional information in order to complete her investigation.

> 15.  Based on the evidence presented to the Court, without objection, Defendant Denis Bergeron continued in November and December 2012 to transfer asserts under his custody and control in further violation of the TRO and Preliminary Injunction.

> . . . .

> 17.  Defendants' continued noncompliance with and violation of the TRO and the Preliminary Injunction, and in particular the violations of and noncompliance by Defendant Denis Bergeron with the TRO and the Preliminary Injunction as set forth in Findings of Fact ¶ 12 of the Contempt Order, have been willful, without any justification, and inexcusable.[9]

On May 5, 2013, and while in custody pursuant to the second contempt order, the debtor

filed a voluntary petition seeking relief under chapter 11 of the Bankruptcy Code.  The state court

---

[9] In accordance with common local practice in the superior and district courts of North Carolina, these contempt orders were most likely prepared by the prevailing party, Prestige.  As a result, in this court's opinion, the specific findings made therein tend to be comprised of broader language than those which would have been drafted by the assigned state court judge.

action, including the ancillary contempt proceeding, was stayed pursuant to § 362 and the debtor was released from custody. See In re Raprager, No. 12–06231–8–SWH, at 10–11 (Bankr. E.D.N.C. Jan. 15, 2013).

Twenty days after the petition date, on May 23, 2013, Prestige filed the motion currently before the court, seeking appointment of a chapter 11 trustee pursuant to § 1104(a).[10]  The debtor filed an objection opposing the appointment of a chapter 11 trustee on June 10, 2013, arguing that the motion is an attempt by Prestige to insulate itself from liability arising from its continuous and rabid collection methods.

## DISCUSSION

Appointment of a chapter 11 trustee is controlled by § 1104(a), which provides:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

    (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

    (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).  "The appointment of a trustee in a chapter 11 case is an extraordinary remedy, and there is a strong presumption in favor of allowing the debtor to remain in possession." In re

---

[10] Prestige seeks the appointment of a trustee under § 1104(a)(1) and § 1104(a)(2). Although its motion makes reference to the best interest language of § 1104(a)(2), all of the evidence presented by Prestige was designed to demonstrate the existence of cause under § 1104(a)(1).

Tanglewood Farms, Inc. of Elizabeth City, No. 10–06719, 2011 WL 606820, at *2 (Bankr. E.D.N.C. Feb. 10, 2011) (citing In re Heck's Props., 151 B.R. 739, 756 (S.D. W. Va. 1992)); In re Taub, 427 B.R. 208, 225 (Bankr. E.D.N.Y. 2010) ("The appointment of a trustee is an unusual remedy and '[t]he standard for § 1104 appointment is very high . . . .'" (quoting Adams v. Marwil (In re Bayou Grp., LLC), 564 F.3d 541, 546 (2d Cir. 2009))).   Because "appointment of a trustee should be the exception, rather than the rule[,]" In re Sharon Steel Corp., 871 F.2d 1217, 1225–26 (3d Cir. 1989) (citations omitted), the movant must demonstrate, by clear and convincing evidence, the grounds for appointment of a trustee under both subsections of § 1104(a). Tanglewood Farms, 2011 WL 606820, at *2; see In re LHC, LLC, 497 B.R. 281, 291 (Bankr. N.D. Ill. 2013) ("Applying the clear and convincing evidence standard appears . . . to be more consistent with the presumptions that a debtor should generally be permitted to remain in control and possession of its business and that the appointment of a Chapter 11 trustee is an extraordinary remedy."(citation omitted)).

## I.    Section 1104(a)(1)

Prestige alleges that the debtor's propensity for fraud, dishonesty, incompetency along with the instances of prepetition mismanagement and anticipated gross mismanagement of the assets of the bankruptcy estate warrant appointment of a chapter 11 trustee under § 1104(a)(1).  Specifically, it contends that the debtor's conduct, all of which occurred during the course of the state court action, including his willful disobeyance of the temporary restraining order and preliminary injunction and disregard for the judicial process, constitutes "other similar cause" thereby warranting appointment of a trustee.

Under § 1104(a)(1), the "determination of cause . . . is within the discretion of the court and due consideration must be given to the various interests involved in the bankruptcy proceeding."

12

Dalkon Shield Claimants v. A.H. Robins Co., 828 F.2d 239, 242 (4th Cir. 1987) (quoting In re Gen.

Oil Distrs., Inc., 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984)).  The statute, however, should be

flexibly applied because "the concepts of incompetence, dishonesty, gross mismanagement and even

fraud all cover a wide spectrum of conduct." Id.  In determining whether cause exists to support the

appointment of a trustee, courts may consider a wide variety of factors including, inter alia, whether

the alleged misconduct or mismanagement was material. See In re TAAF, LLC, No. 10–00171, 2010

WL 582436, at *1 (Bankr. E.D.N.C. Feb. 12, 2010); In re Daily, No. 309–05337, 2009 WL 3415204,

at *3 (Bankr. M.D. Tenn. Oct. 19, 2009).  In exercising this discretion, "due consideration must be

given to the various interests involved in the bankruptcy proceeding." A.H. Robins, 828 F.2d at 241;

see General Oil Distributors, 42 B.R. at 409 ("While under  1104(a)(1) the Court is not directly

called upon to weigh the costs and benefits of appointing a trustee, it nevertheless cannot ignore the

competing benefit and harm that such an appointment may place upon the estate." (citation and

emphasis omitted)).  Even "in circumstances where fraud or mismanagement is present, the

legislative history of § 1104(a)(1) suggests that the court . . . 'balance the benefit to be gained from

such an appointment against the detriment to the reorganization effort and the rights of the debtor

that may result from such an appointment.'" In re Hamilton, No. 11–07491, 2012 WL 2204904,

at *3 (Bankr. E.D.N.C. June 14, 2012) (quoting 7 Collier on Bankruptcy ¶ 1104.02[3][b] (Alan N.

Resnick & Henry J. Sommer eds., 16th ed.)).  If, however, the court determines that cause exists,

appointment of a trustee is mandatory. In re Davis, Nos. 09–10198, 10–02711, 2010 WL 2640587,

at *2 (Bankr. E.D.N.C. June 29, 2010) ("[O]nce the court makes a finding that cause exists under

§ 1104(a)(1), 'there is no discretion; an independent trustee must be appointed." (citation omitted);

In re 1031 Tax Grp., LLC, 374 B.R. 78, 86 (Bankr. S.D.N.Y. 2007).

13

In making the cause determination, the plain language of § 1104(a)(1) calls for an examination of both prepetition and postpetition conduct of the debtor or its management, see Fraidin v. Weitzman (In re Fraidin), No. 94–1658, 1994 WL 687306, at *2 (4th Cir. Dec. 9, 1994) (unpublished); however, the general "focus is on the debtor's current management, not the misdeeds of past management." 1031 Tax Group, 374 B.R. at 86 (citation omitted); In re Sletteland, 260 B.R. 657, 672 (Bankr. S.D.N.Y. 2001) (holding that "on a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct."); In re Eagle Creek Subdivision, LLC, No. 08–04292, 2009 WL 613173, at *2 (Bankr. E.D.N.C. Mar. 9, 2009) ("Generally, the court must narrow its focus to the actions of current management when investigating cause for appointment of a trustee."(citation omitted)).

Isolated instances of prepetition mismanagement, fraud, dishonesty or other misconduct by the debtor or its management are not sufficient to support a finding of cause under § 1104(a)(1). See Gomez v. U.S. Trustee, No. 7:09–CV–496, 2010 WL 582706, at *2 (W.D. Va. Feb. 18, 2010) (recognizing "that the mere existence of a prior felony conviction will not justify the appointment of a trustee in every Chapter 11 case . . . ."). In those situations, courts have been reluctant to appoint a trustee absent signs of postpetition mismanagement or misconduct because "[s]peculation that a debtor may do something in the future does not overcome the strong presumption that the debtor should be permitted to remain in possession in a chapter 11 case or justify the additional costs of a trustee." Sletteland, 260 B.R. at 672 (citations omitted); see In re Crescent Beach Inn, 22 B.R. 155, 159 (Bankr. D. Me. 1982) (holding that the debtor's mismanagement, which was due to its lack of sophistication, did not constitute gross mismanagement required under § 1104(a)(1), particularly in the absence of any signs of postpetition mismanagement). This reluctance is attributable to the

14

fact that "some degree of mismanagement [or misconduct] exists in virtually every insolvency case." Crescent Beach Inn, 22 B.R. at 159 (citations omitted).  In Crescent Beach Inn, for example, evidence that the debtor's mismanagement of its affairs, including numerous overdrawn checks, inadequate and "messy" bookkeeping, lapses in insurance coverage and failure to file the requisite reports with the United States Trustee, "did not rise to the level of gross mismanagement." Id. at 159–60.  Gross mismanagement, on the contrary, "suggests some extreme ineptitude on the part of management to the detriment of the organization. . . . ris[ing] above simple mismanagement to achieve the level envisioned by the Code." In re Sundale, Ltd., 400 B.R. 890, 907 (Bankr. S.D. Fla. 2009) (citation omitted).

The extraordinary circumstances warranting appointment of a trustee "are those in which the debtor or its managers have engaged in serious fraud or dishonesty, or have grossly mismanaged the business." Davis, 2010 WL 2640587, at *2 (citations and alterations omitted).  Mere allegations, which are contested, that a debtor or its management have engaged in fraud, dishonesty or other similar conduct are not sufficient to warrant appointment of a trustee. See In re Piedmont Center Invs., LLC, No. 11–06178, 2011 WL 5903398, at *3–4 (Bankr. E.D.N.C. Sept. 8, 2011); Hamilton, 2012 WL 2204904, at *3; Tanglewood Farms, 2011 WL 606820, at *2; In re Concord Coal Corp., 11 B.R. 552, 553 (Bankr. S.D. W. Va. 1981) (holding that appointment of a trustee is not warranted where "fraud and dishonesty have been alleged but not proven.").

As Tanglewood Farms and Piedmont Center Investments illustrate, allegations of prepetition fraud, dishonesty or mismanagement, by themselves, are not sufficient to warrant appointment of a trustee.  In Tanglewood Farms, the court refused to appoint a chapter 11 trustee based on its finding that the prepetition fraudulent ruse perpetrated by the debtor's president and sole shareholder

15

"d[id] not rise to the level of gross mismanagement or fraud." 2011 WL 606820, at *2. The debtor's management in Tanglewood Farms, who operated its granary storage facility, sold commingled grain and utilized a bank account opened in the name of a separate entity, allowing proceeds received from the sale of grain to be diverted from the debtor's largest lien creditor. Id. at *1.[11]  Despite the existence of this fraudulent scheme, the court could not find that any creditor suffered actual harm as a result. Id. at *2. The court further recognized that if a trustee were to be appointed, "he or she would largely ratify the [postpetition] decisions already made by the debtor[] and the Chief Restructuring Officer." Id.  In reaching its conclusion—that a chapter 11 trustee was not necessary—the court opined:

> Bankruptcy courts are generally reluctant to displace the management and control of the debtors' business unless extraordinary circumstances warrant it. There is no justification here for disrupting the debtors' business. Appointment of a chapter 11 trustee will only result in unnecessary expense and costs to the detriment of the debtors' remaining creditors.

Id. By contrast, the court in Piedmont Center Investments found "sufficient evidence of pre–petition fraud to meet the high standard associated with appointment of chapter 11 trustee." 2011 WL 5903398, at *4.  In that case, the partial owner and manager of the debtor was indicted by a federal grand jury prior to the petition date, on fifteen felony counts relating to bank fraud, false statements, and identity theft based on representations he made to four separate financial institutions. Id. at *1.  Despite appointing a trustee, the court emphasized that "[a]lthough the indictments are primae [sic] facie evidence of fraud, the court would not appoint a trustee on this basis alone." Id.

---

[11]  The president of the debtor in Tanglewood Farms subsequently pled guilty to transportation of stolen goods in interstate commerce in the United States District Court for the Eastern District of North Carolina and, in addition to restitution, was sentenced to one year of home confinement and five years of probation.

at *4. Specifically, the court found that a letter drafted by the debtor's manager to his spouse, which detailed a twenty–one step process to be undertaken in the future to fake and financially maximize his own death, "demonstrate[d] a sophisticated ability to concoct a fraudulent scheme and to hide assets." Id.

The court, in exercising its discretion and after careful consideration of the interests involved, finds that the mismanagement and misconduct at issue, which culminated in the debtor being held in civil contempt for willfully disobeying the temporary restraining order and preliminary injunction in the state court action, were responses to the "scorched earth" strategy utilized by Prestige and are not sufficient to constitute cause. See A.H. Robins, 828 F.2d at 241.[12] Despite Prestige's argument to the contrary, these poor decisions and improper conduct, for which the debtor paid dearly, do not justify the appointment of a trustee. The facts of the instant case are akin to those in A.H. Robins, where a creditors' committee moved for the appointment of a chapter 11 trustee after the debtor, A.H. Robins Company ("Robins"), was held in civil contempt of a consent order prohibiting it from selectively paying off prepetition claims absent court approval. Id. at 240 (recognizing that "[t]he [district] court found that the debtor had not only 'knowingly, unknowingly, or because of failure to comprehend the Court's order violated a court order, but also had taken certain actions prohibited by both the spirit and the letter of the bankruptcy laws.'" (alterations omitted)). The district court, however, declined to appoint a chapter 11 trustee pursuant to § 1104(a). Id. (stating that the district court found "that although a finding of civil contempt was

---

[12] The court need not address whether the doctrine of collateral estoppel precludes the debtor from challenging the above–referenced findings made by the state court in its contempt orders because these findings of civil contempt do not, by themselves, constitute cause under § 1104(a)(1). See A.H. Robins, 828 F.2d at 240–41.

warranted because of Robins' abuses, civil contempt was not to be equated with cause for appointment of a trustee under Section 1104(a)(1)."). On appeal, the Fourth Circuit affirmed and held that the district court did not abuse its discretion in declining to appoint a chapter 11 trustee where a debtor was held in civil contempt, as a sanction for paying certain prepetition debts without prior court approval. Id. at 241 ("Given the court's discretion and the careful consideration that it gave to the interests involved, we find that the court did not err in declining to find cause. The court's decision not to appoint a trustee was . . . within its discretionary authority and it is clear that the court did not abuse this authority."). After acknowledging that "Robins' conduct was improper and warranted a civil contempt sanction[,]" id. at 240, the Fourth Circuit observed that "to require the appointment of a trustee, regardless of the consequences, . . . could frustrate the purpose of the Bankruptcy [Code]." Id. at 241.        The debtor in this case lacks sophistication. See Crescent Beach Inn, 22 B.R. at 159. This lack of sophistication, which is not synonymous with incompetence, guides the court's determination of whether cause exists under § 1104(a)(1). See Sharon Steel, 871 F.2d at 1227 (emphasizing that, in making the determination under § 1104(a)(1), the sophistication displayed by the debtor's management "colors the interpretation of their actions."). The court recognizes that the debtor's actions or lack thereof prepetition, the consequence of which resulted in him being incarcerated for civil contempt and prompted the motion currently before the court, were the product of the pressure placed on him by the relentless collection efforts employed by Prestige. This pressure  placed the debtor in a constant state of fear, paranoia and panic, the effects of which likely tainted his prepetition management of his affairs. It is reasonable to assume that the debtor's bankruptcy filing was prompted by this lack of sophistication and the poor financial and management decisions he made in response to, and as a result of, the methods employed by Prestige

prepetition.  See In re St. Louis Globe–Democrat, Inc., 63 B.R. 131, 138 (Bankr. E.D. Mo. 1985) (holding that "it is reasonable to assume that the majority of businesses that arrive in chapter 11 have exercised a certain degree of incompetence or mismanagement.").  The court is strongly persuaded by the debtor's testimony regarding his interpretation of the temporary restraining order, preliminary injunction and contempt orders entered by the state court—that he misunderstood how he could be enjoined from accessing virtually all of his assets.  A literal reading of the limitations and restrictions placed on the debtor by those orders prohibited him from using any of the loan proceeds or any funds of IYB, thus preventing him from providing food or other necessaries for his family.  Additionally, these state court orders, if read literally, prevented the debtor from protecting any of his assets from improper or overreaching collections efforts employed by Prestige until a full adjudication of the state court action—at which time, all of the assets repossessed or recovered by Prestige may have already been liquidated.

Although the debtor's finances and affairs could have been managed better prepetition, this poor management coupled with the fact that the findings made by the state court in its contempt orders were the result of allegations advanced by Prestige in a prejudgement circumstance, are not sufficient to warrant the appointment of a trustee. See, e.g., Sundale, 400 B.R. at 907 (recognizing that "[p]oor management alone does not warrant appointment of a trustee."(citations omitted)); In re Mitchell, No. 11-08880, 2012 WL 2205372, at  *3 (Bankr. E.D.N.C. June 14, 2012) (refusing to appoint a trustee where "[t]he debtor's conduct . . . does not have the requisite indicias of fraud to warrant a finding of cause."); Concord Coal, 11 B.R. at 553.  The debtor, as one of the state court defendants, filed an answer in the state court action contesting the alleged default under the promissory note and security instruments and no final adjudication of that default has been made.

Case 13-02912-8-SWH   Doc 164   Filed 10/31/13   Entered 10/31/13 13:28:50   Page 20 of 23

None of these allegations have been proven and are all contested by the debtor. <u>Concord Coal</u>, 11 B.R. at 553; <u>In re Costa Bonita Beach Resort, Inc.</u>, 479 B.R. 14, 45 (Bankr. D.P.R. 2012). The evidence suggests that the debtor did not fully understand that his actions, including the transfer of the loan proceeds to separate entities and use of such to defray certain expenses that were not attributable to IYB, were expressly prohibited by the temporary restraining order and the preliminary injunction. He simply could not fathom that the orders entered in the state court action, including the temporary restraining order, preliminary injunction and the contempt orders, left him without any means to support his family from any of his previously profitable entities and enterprises. Furthermore, the debtor's sequestration of certain assets and collateral, which he contends were not encumbered by the security instruments, were desperate attempts to thwart the relentless collection efforts of Prestige. Although these prepetition decisions are highly questionable, errors in judgment plague most chapter 11 debtors and are not sufficient to establish cause. <u>In re Cardinal Indus., Inc.</u>, 109 B.R. 755, 759 (Bankr. S.D. Ohio 1990) ("Most Chapter 11 debtors have histories of past errors in judgment, . . . so those mistakes alone should not be sufficient grounds to establish cause for the appointment of a trustee.").

Consequently and because there is no evidence that the debtor has or will attempt similar misconduct now that this court, the bankruptcy administrator and Prestige are scrutinizing his actions, <u>see</u> <u>Daily</u>, 2009 WL 3415204, at *3, appointment of a trustee for cause pursuant to § 1104(a)(1) is not appropriate.

## II.  Section 1104(a)(2)

In the alternative and pursuant to § 1104(a)(2), Prestige contends that appointment of a trustee is in the best interest of creditors and the estate because it is necessary to prevent the debtor

from secreting, wasting, damaging, diverting, converting or otherwise misappropriating the assets of the estate.

Section 1104(a)(2), contrary to subsection (a)(1) where appointment of a trustee is mandatory upon specific finding of cause, "envisions a flexible standard . . . . giv[ing] discretion to appoint a trustee 'when to do so would serve the parties' and estate's interests.'" Marvel Entm't Grp., Inc., 140 F.3d 463, 474 (3d Cir. 1989) (citation omitted); 1031 Tax Group, 374 B.R. at 91 (stating that "§ 1104(a)(2) reflects 'the practical reality that a trustee is needed.'" (quoting In re V. Savino Oil & Heating Co., 99 B.R. 518, 527 n.11 (Bankr. E.D.N.Y. 1989))).  Under § 1104(a)(2), the court utilizes a cost/benefit analysis and general principles of equity to determine whether appointment of trustee is in the best interests of the estate and all the constituents involved. 11 U.S.C. § 1104(a)(2); see 7 Collier on Bankruptcy ¶ 1104.02[3][d][ii] (summarizing the cost/benefit analysis under § 1104(a)(2)).  In balancing these anticipated benefits and accompanying costs, the following factors are given consideration: "(1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for rehabilitation; (3) whether the business community and creditors of the estate have confidence in the debtor; and (4) whether the benefits outweigh the costs." LHC, 2013 WL 3760109, at *9 (citation omitted); see Sundale, 400 B.R. at 909 ("Loss of confidence, or extreme acrimony[] . . . constitute elements relevant to the decision of whether it is in the best interests of creditors and others under section 1104(a)(2) to appoint a trustee."(citations omitted)). "[A] creditor, no matter how dominant, cannot justify the appointment of a trustee simply because it would be in its own interests.  It must show that the appointment is in the interests of all those with a stake in the estate, which includes the debtor and his family." Daily, 2009 WL 3415204,

at *5 (refusing to appoint a trustee under § 1104(a)(2) where the cost of appointment would provide no benefit).

The court, after weighing the costs and benefits associated with the appointment of a trustee, finds that Prestige has also failed to demonstrate that a chapter 11 trustee is necessary in this case pursuant to § 1104(a)(2). Specifically, the evidence presented failed to establish that appointment of a trustee would be in the best interests of any other party besides Prestige. See Daily, 2009 WL 3415204, at *5. There has been no showing that the benefits accompanying the appointment of a trustee outweigh the detriment to the bankruptcy estate. See 7 Collier on Bankruptcy ¶ 1104.02[3][d][ii] ("The 'interests' standard suggests a balancing of costs and benefits in determining whether the appointment of a trustee is appropriate. Such an appointment would be in the interests of the estate if the benefits to all interests of the estate to be derived from a trustee outweigh the detriment to the estate"). All of the evidence suggests, to the contrary, that the costs accompanying such an appointment would impose a substantial financial burden on the debtor and the estate that exceeds any benefit. With the assistance of counsel, the debtor is fully capable and has complied with the duties, obligations and reporting requirements imposed upon him by chapter 11 of the Bankruptcy Code. 7 Collier on Bankruptcy ¶ 1104.02[3][d][ii] (recognizing that "[w]hen current management is competent and able to adjust to its new obligations under chapter 11, . . . there may in fact be little or no benefit to the appointment of a trustee."). Where, as here, the chapter 11 process is sufficient to protect the interests of the debtor, the bankruptcy estate and creditors, a chapter 11 trustee is not necessary. See Daily, 2009 WL 3415204, at *3.

## CONCLUSION

Based on the foregoing, Prestige has failed to demonstrate, by clear and convincing evidence, that appointment of a trustee is warranted pursuant to § 1104(a)(1) or § 1104(a)(2) under these circumstances. See 7 Collier on Bankruptcy ¶ 1104.02[1] (indicating that appointment of a trustee is necessary where "it is inappropriate to permit the debtor and its management to continue in possession." ).  The court's decision is consistent with "the overriding philosophy of Chapter 11, which is "to the give the debtor a second chance" [;] therefore, "current management should be permitted to identify and correct its past mistakes." A.H. Robins, 828 F.2d at 240-41 (citation omitted); accord In re Ionosphere Clubs, Inc., 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).  In holding that Prestige has failed to provide clear and convincing evidence that appointment of a trustee is warranted under these circumstances, the court is not condoning the debtor's prepetition conduct and actions.  Given this concern, debtor's postpetition conduct will be monitored and should he exhibit any substantial violation of the duties, obligations and requirements imposed upon him by the Bankruptcy Code, the court will consider additional relief, which may include the appointment of a trustee at a later point in the case.  Accordingly, the motion for the appointment of a chapter 11 trustee is **DENIED.**

**SO ORDERED.**

### END OF DOCUMENT